# UNITED STATES DISTRICT COURT

# DISTRICT OF CONNECTICUT

LINDA P. PASSANISI,        :
     Plaintiff,         :
                      :
        -vs-          :     Civil No. 3:06cv313 (PCD)
                      :
BERKLEY ADMINISTRATORS OF   :
CONNECTICUT, INC.,         :
     Defendant.         :

## RULING ON MOTIONS FOR SUMMARY JUDGMENT & MOTION TO COMPEL

Plaintiff's *pro se* complaint alleges that she was terminated on the basis of her disability, in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101 et seq. Defendant, Berkley Administrators of Connecticut, Inc. ("BA"), moves, pursuant to Federal Rule of Civil Procedure 56, for summary judgment on Plaintiff's complaint. For the reasons that follow, Defendants' Motion for Summary Judgment [Doc. No. 20] is **granted**, Plaintiff's Motion for Summary Judgment [Doc. No. 16] is **denied**,[1] and Plaintiff's Motion to Compel [Doc. No. 25] is **denied**.

## I.    BACKGROUND[2]

Plaintiff was hired by BA on October 2, 1997 as a Hearing Representative. Her job

---

[1]    Notwithstanding the title of Plaintiff's brief, its content and responsive nature indicates that it is an opposition brief to Defendant's Motion for Summary Judgment and not a separate motion. It will be treated as such in dealing with Defendant's motion. The references to Plaintiff's Motion for Summary Judgment being denied are simply for clerical purposes, as the document was docketed as a pending motion. Moreover, the document entitled "Plaintiff's Local Rule 56(a)(1) Statement of Undisputed Facts" is responsive, paragraph by paragraph, to Defendant's Local Rule 56(a)(1) Statement, and therefore, will be referred to and treated herein as a Local Rule 56(a)(2) Statement.

[2]    The facts as set forth herein are taken primarily from the parties' Local Rule 56(a) Statements. Plaintiff's Local Rule 56(a)(2) Statement does not appropriate "admit" or "deny" the facts set forth in Defendant's Local Rule 56(a)(1) Statement, however, in deference to her *pro se* status, the Court will incorporate Plaintiff's version of the facts—excluding arguments or conclusory statements—to the extent possible.

responsibilities included, *inter alia*, representing BA and its clients at workers' compensation hearings at various Workers' Compensation Commission ("WCC") offices across Connecticut, and drafting hearing reports summarizing the hearings. According to Plaintiff, during the time that BA had a contract with the State of Connecticut to be the third party administrator for the State's workers' compensation claims, she participated in approximately 900 to 1,000 hearings per year. Before joining BA, Plaintiff worked as a staff representative for the Connecticut Employees Union Independent, where she represented injured workers who had filed workers' compensation claims.

In late 2001, BA learned that it was going to lose—as of January 1, 2002—its contract with the State of Connecticut. As a result, BA was forced to issue layoff notices to many of its employees, including Plaintiff, in late 2001. Plaintiff, like the other employees, was notified that her employment would be terminated after the first of the year as a result of the loss of the State contract. On January 2, 2002, Plaintiff's last scheduled day of work, BA President Richard McKenna asked Plaintiff to stay on in her position for an additional fifteen days, while BA determined whether it could obtain another contract. Plaintiff agreed to stay, and BA eventually informed Plaintiff and several other employees who had been scheduled for layoff that it had obtained another contract that would allow these employees to keep their jobs.

According to Defendant, BA employees were subject to greater supervision than they had been in prior years after the loss of BA's contract with the State, as a result of handling fewer claims and having fewer employees to manage.[3] In 2003, Plaintiff's supervisor, Jeffrey Drake,

---

[3] Plaintiff notes that BA's supervision prior to the termination of its contract with the State was "good enough to fire two employees who were labeled by the Defendant as 'Employees terminated for reasons similar to the reason for [Plaintiff's] termination.'" (Pl.'s Local Rule 56(a)(2)

2

provided Plaintiff with a performance review discussing Plaintiff's generally good job performance and documenting certain areas in need of improvement. Specifically, the review detailed two areas of concern: (1) Plaintiff had failed to apply the holding of a recent workers' compensation decision at a WCC hearing, resulting in a claimant receiving more benefits from BA's client than were legally required; and (2) Plaintiff had a tendency to pay benefits when the injured worker had not proven that he or she was actually entitled to benefits. (Exempt Evaluation/Review Form, Apr. 2, 2003, Def.'s Ex. B.)[4] Essentially, the performance review documented BA's concern that Plaintiff was not adequately representing BA's clients, the employers of the injured workers, noting that "[a]t times, [Plaintiff] appears to take a dual role approach at hearings by also acting as a claimant advocate." (Id.) In response, Plaintiff contends that the holding she failed to apply at a WCC hearing was a new decision and that Drake also failed to apply the holding at a January 2, 2003 WCC hearing. (See Jan. 2, 2003 Hearing Memo, Pl.'s Ex. C.)[5]

---

Statement ¶ 11.) In Richard McKenna's deposition, he testified that two employees were fired for reasons similar to Plaintiff, meaning that they also violated company policies, although the violations themselves differ. (McKenna Dep. at 22:4-24:5, Nov. 3, 2006, Pl.'s Ex. A.)

[4] The evaluation recognizes Plaintiff's "thorough knowledge of the Workers' Compensation statutes," but notes that "there have been a number of occasions in the past year in which [Plaintiff] has not applied this knowledge in her hearing representation." The evaluation cites two examples, namely the "non-application of the Iannarone decision when agreeing to 308a orders," and "a willingness to pay or advance benefits when the claimant has not met his/her burden of proof." (Exempt Evaluation/Review Form.)

[5] In his summary of the hearing, Drake writes: "Please note that I erred in not taking into account that the total amount of 'counterparts pay' noted in the 12/12/02 hearing note included overtime pay. At the hearing, I gave the Chairman total counterpart pay of $1120.77 and did not indicate that this included OT adjustment of $197. I doubt this would have changed the Chairman's 308a recommendation . . . . I note this so that the correct calculations can be provided to the Commissioner at the next hearing to either negate further 308a if the claimant secures employment with wages higher than min. wage, or possibly argue for a lower 308a rate." (Jan. 2, 2003 Hearing Memo.)

In the summer of 2003, Plaintiff was assigned to a new supervisor, Carol Connelly, who had a discussion with Plaintiff regarding the concerns that had been a part of Plaintiff's April 2, 2003 performance review. On September 22, 2003, at approximately 4:00 p.m. in the afternoon, Plaintiff placed a telephone call to Larry Savo, an employee of the City of Bridgeport, who had a pending claim for workers' compensation benefits that BA was administering. Plaintiff had been asked to call Savo by a WCC Commissioner who was friends with him. During this call, Plaintiff provided assistance and advice to Savo regarding his claim, suggesting that he request a hearing regarding the denial of a benefit and telling him to obtain medical evidence to support his claim. Betsy Bertinuson-Bonavita, a supervisor at BA, overheard Plaintiff's side of the conversation. Bertinuson-Bonavita immediately approached Plaintiff with a note instructing her to end the call and informing her that she could not "counsel a claimant." Plaintiff ended the call and discussed the incident with Bertinuson-Bonavita. Bertinuson-Bonavita told Plaintiff that her conduct had placed her job in jeopardy.

One week later, on September 29, 2003, BA held a meeting with Plaintiff, Connelly and Lydia Gomez, BA's office and human resources manager, and gave Plaintiff a written warning as a result of her phone call to Savo. The written warning noted that the meeting was being held "to discuss the seriousness of [Plaintiff] being an advocate for claimants," and went on to document the incidents of which BA was aware that raised concerns in this regard. (Written Warning, Sept. 29, 2003, Def.'s Ex. B.) The warning set forth the following incidents: (1) In early 2003, Plaintiff provided a list to a claimant, Rose Kaczmarek,[6] of her claims against the State of Connecticut, a former client. The information was privileged and the property of the State; BA

---

[6]      Kaczmarek was a high school classmate of Plaintiff's.

contends that it was not at liberty to divulge such information. (2) During the summer of 2003, Connelly spoke with Plaintiff regarding BA's concerns that Plaintiff was advising claimants. (Id.) The warning also discusses the September 22, 2003 incident involving Plaintiff's phone call to Savo. (Id.) The warning explained that Plaintiff's conduct could expose BA to "E&O claims and/or liability issues," and noted that "[f]ailure to comply with the directives in the warning will result in immediate disciplinary procedures up to and including termination of employment." (Id.) Plaintiff signed the warning, acknowledging her receipt of it. (Id.)

Plaintiff disagreed with the written warning and sought the advice of various acquaintances at the WCC offices, including Commissioners before whom BA hearing representatives regularly appeared on behalf of their clients. Plaintiff admitted in her deposition that she asked her acquaintances at the WCC offices for their advice about whether she had done anything wrong by "advising" a claimant. (Passanisi Dep. at 124:, Oct. 26, 2006, Def.'s Ex. A.) Plaintiff testified that she did not agree with Gomez and Connelly's definition of "counseling" or "advising" a client and did not feel that doing so should be against company policy. (Id. at 126:8-24.)

On October 8, 2003, Connelly and Gomez called Plaintiff into another meeting, in which McKenna, BA's President, also participated. During this meeting, McKenna informed Plaintiff that BA had received word that Plaintiff had been discussing this matter at the Commission offices and advised her that doing such was inappropriate, adverse to BA's interests and could not continue. (Oct. 8, 2003 Memo, Def.'s Ex. B.) McKenna also counseled Plaintiff about the issues that were raised in the September 29, 2003 written warning. (Id.)

Shortly after the October 8 meeting, Connelly learned from an employee of a law office in

Waterbury, Connecticut that handles workers' compensation claims that Plaintiff had been "bad-mouthing" one of BA's employees, Jackie Libano, at the Waterbury WCC office. (CHRO Fact Finding Trans. 50, Jan. 28, 2005, Def.'s Ex. D.) Because this appeared to be "a continuation of a pattern of behavior that had been developing," Connelly discussed the incident with her supervisor, Bertinuson-Bonavita, and the two of them discussed it with McKenna. (Id. at 50-52.) Connelly, Bertinuson-Bonavita and McKenna collectively decided to terminate Plaintiff's employment. (Id.) BA began processing paperwork for Plaintiff's termination on Thursday, October 30, 2003, and terminated Plaintiff's employment on Monday, November 3, 2003. Plaintiff testified in her deposition that she lost her job "not because [she] wasn't doing it in the way it should be done, but because some people did not like the way [she] was doing it." (Passanisi Dep. 150:17-23.) Plaintiff believes that her interpretation of workers' compensation policies and is different from BA's policies. (CHRO Fact Finding Trans. 60; Pl.'s Local Rule 56(a)(2) Statement.)

Plaintiff was diagnosed with multiple sclerosis ("MS") in 1979. Except for Jackie Libano, one of Plaintiff's coworkers and peers at BA, Plaintiff never told anyone at BA that she had MS. Libano testified that she told Drake about Plaintiff's MS, and acknowledged that she told Plaintiff that she told McKenna about Plaintiff's MS, but that she does not have a recollection of actually doing so. (Libano Dep. at 9:14-10:16, Nov. 3, 2006, Def.'s Ex. E.) She denies telling anyone else at BA about Plaintiff's MS. (Id. at 10:21-22.) Plaintiff asserts that Libano did tell her that she told McKenna that Plaintiff had MS. (Pl.'s Local Rule 56(a)(2) Statement.) McKenna denies any knowledge of Plaintiff's MS and testified that Libano never told him that Plaintiff had MS. (McKenna Dep. at 115:5-14, Nov. 3, 2006, Def.'s Ex. C.)

According to his affidavit, Drake became aware of Plaintiff's diagnosis of MS "sometime in 2002" when Plaintiff and Libano were participating in a fund-raising activity in support of MS. (Drake Aff. ¶ 6, Feb. 2, 2005, Def.'s Ex. F; CHRO Fact Finding Trans. 76.)

Libano mentioned to Drake in early 2002 that Plaintiff's legs had been cramping on the long drives to and from Bridgeport for WCC hearings. (Drake Aff. ¶ 9; CHRO Fact Finding Trans. 76-78.) Subsequent to his conversation with Libano, when arranging schedules for workers' compensation hearings, Drake took into consideration—along with other factors affecting other employees' schedules—the fact that Plaintiff's legs had been cramping on long drives and tried to avoid scheduling Plaintiff for hearings in Bridgeport. (Drake Aff. ¶ 10; CHRO Fact Finding Trans. 78.) With this change, Plaintiff still represented BA's clients in the same capacity and with the same work load that she had before Drake took her condition into consideration. (CHRO Fact Finding Trans. 78-79; Drake Aff. ¶ 11.) Plaintiff continued to participate in hearings on behalf of BA clients.

Plaintiff does not require any type of corrective device or measures to walk, drive or function in her daily life. She has never missed a day of work as a result of her MS and testified that the MS "never really bothered [her]." At her deposition, Plaintiff identified "walking" as the only major life activity limited by MS, claiming that she is substantially limited in her ability to walk because she cannot walk quickly, and cannot run, skip, hop or jump. Plaintiff also testified that her "balance is off," that she has difficulty climbing stairs, and that she has "constant numbness" or tingling feeling in her hands and feet. She does not use a cane or anything else to help her walk. Plaintiff never requested an accommodation from anyone at BA as a result of her MS, and testified that she never needed an accommodation from any employer as a result of MS.

She also testified that she is "very healthy." (Passanisi Dep. 14-15, 31-36.)

## II.   SUMMARY JUDGMENT STANDARD OF REVIEW

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). No genuine issue of material fact exists and summary judgment is therefore appropriate when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 69, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). A material fact is one which "might affect the outcome of the suit under the governing law" and an issue is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Importantly, however, "[c]onclusory allegations will not suffice to create a genuine issue." Delaware & H.R. Co. v.Conrail, 902 F.2d 174, 178 (2d Cir. 1990).

The moving party bears the burden of establishing that summary judgment is appropriate, Anderson, 477 U.S. at 225, however, when moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant can satisfy its burden of establishing that there is no genuine of material fact in dispute by pointing to an absence of evidence to support an essential element of the non-moving party's claim. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). "A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial. It need only point to an absence of proof on the plaintiff's part, and, at that point, plaintiff must

'designate specific facts showing that there is a genuine issue for trial.'" Parker v. Sony Pictures Entm't, Inc., 260 F.3d 100, 111 (2d Cir. 2001) (quoting Celotex, 477 U.S. at 324); see also Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1223-24 (2d Cir. 1994) ("The moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case.") The non-moving party, in order to defeat summary judgment, must then come forward with "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249. In making this determination, the Court draws "all factual inferences in favor of the party against whom summary judgment is sought, viewing the factual assertions in materials such as affidavits, exhibits, and depositions in the light most favorable to the party opposing the motion." Rodriguez v. City of N.Y., 72 F.3d 1051, 1060 (2d Cir. 1995) (citations omitted). However, a party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading." Fed. R. Civ. P. 56(e).

Determinations of the weight to accord evidence or assessments of the credibility of witnesses are improper on a motion for summary judgment as such are within the sole province of the jury. Hayes v. N.Y. City Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996). "If reasonable minds could differ as to the import of the evidence . . . and if . . . there is any evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain a summary judgment." R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 59 (2d Cir. 1997) (internal citations omitted); see also Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000) ("When reasonable persons applying the proper legal standards could differ in their responses to the questions raised on the basis of the evidence

presented, the question is best left to the jury.").

Where, as here, the plaintiff is proceeding *pro se*, she is granted additional deference. See Haines v. Kerner, 404 U.S. 519, 520, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972) (holding the allegations of a *pro se* complaint to "less stringent standards than formal pleadings drafted by lawyers")

## III.    MOTIONS FOR SUMMARY JUDGMENT[7]

The ADA prohibits discrimination against a "qualified individual with a disability because of the disability" in the "terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).  ADA claims are analyzed under the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).  Plaintiff must first establish a prima facie case of discrimination; Defendant must then offer, through the introduction of admissible evidence, a legitimate non-discriminatory reason for Plaintiff's termination; the burden then shifts back to Plaintiff to produce evidence and carry the burden of persuasion that Defendant's proffered reason for her termination is pretext for discrimination. Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 169 (2d Cir. 2006).

In order for Plaintiff to establish a *prima facie* case of disability discrimination, she must show that: "(1) the defendant is covered by the ADA; (2) plaintiff suffers from or is regarded as

---

[7]    Plaintiff's Complaint alleges age, sex and disability discrimination.  Although she concedes in her Local Rule 56(a)(2) Statement that she has abandoned her sex discrimination claim, she asserts that she has not abandoned her age discrimination claim, asserting that Defendant discriminated against her because "as she got older, her MS was getting worse." (Pl.'s Local Rule 56(a)(2) Statement ¶ 1.)  Notwithstanding this assertion, however, Plaintiff failed to allege or assert anywhere in her Complaint or in her summary judgment papers any facts or arguments giving rise to an age discrimination claim.  In her opposition brief, Plaintiff states that she "never alleged that [Defendant] didn't employ people older than me.  I allege . . . as I got older, my MS was getting worse." (Pl.'s Opp. 7.)  Because there is no evidence in the record supporting a claim of age discrimination, judgment is granted on this claim in favor of Defendant and the analysis will proceed solely with regard to Plaintiff's claim of disability discrimination.

suffering from a disability within the meaning of the ADA; (3) plaintiff was qualified to perform the essential functions of the job, with or without reasonable accommodation; and (4) plaintiff suffered an adverse employment action because of [her] disability or perceived disability." Capobianco v. City of New York, 422 F.3d 47, 56 (2d Cir. 2005). Plaintiff's burden at this stage is a minimal one; she only has to present facts giving rise to an inference of discrimination. See Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). Defendant concedes that it was covered by the ADA and that Plaintiff was "otherwise qualified to perform the essential functions of her job," but asserts that Plaintiff cannot meet the second and fourth prongs of the analysis, namely that she suffers from a disability within the meaning of the ADA or that she suffered an adverse employment action because of this disability.

### A. Disability Under the ADA

Under the ADA, a disability is defined as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). Because Plaintiff does not specify which definition of disability she is proceeding under, her claim will be addressed under all three definitions.

1. Physical or Mental Impairment that Substantially Limits One or More Major Life Activities[8]

---

[8] Courts analyze "actual" disability claims and "record of" disability claims in the same manner when there is no evidence that a plaintiff's impairment actually impaired any major life activity. See Wiechen v. Palos Cmty. Hosp., No. 05 C 4688, 2006 U.S. Dist. LEXIS 70223, at *12 (N.D. Ill. Sept. 28, 2006) (holding that the plaintiff's testimony that he was "capable of performing his job without accommodation of any kind, while making no assertion that he was limited in any other major life activity" was fatal to his claim that he was "actually" disabled under § 12102(2)(A) and that he had a "record of" a disability under § 12102(2)(B)). Because the Court

A three-prong analysis is used to determine whether a plaintiff has a physical or mental impairment that substantially limits one or more of his or her major life activities, and therefore is disabled under subpart (A) of the ADA's definition of disability. Bragdon v. Abbott, 524 U.S. 624, 631, 118 S. Ct. 2196; 141 L. Ed. 2d 540 (1998). Under this analysis, courts must determine: first, whether the plaintiff's condition amounts to a physical or mental "impairment;" second, whether the life activity identified by the plaintiff constitutes a major life activity under the ADA; and third, "whether the impairment substantially limited the major life activity." Id. To prevail in this regard, a plaintiff must establish all three prongs of the analysis. See Colwell v. Suffolk County Police Dep't, 158 F.3d 635, 641 (2d Cir. 1998). It is undisputed that MS constitutes an "impairment" under the ADA. Defendant argues that Plaintiff cannot show that her MS substantially limits any of her major life activities.

Although Plaintiff does not discuss any major life activities in her opposition brief, she testified in her deposition and alleged in her Local Rule 56(a)(2) Statement that she is substantially limited in her ability to walk. EEOC regulations, which are accorded deference in ADA cases in this Circuit, see Muller v. Costello, 187 F.3d 298, 312 & n.5 (2d Cir. 1999), indicate that walking is a major life activity. See 29 C.F.R. § 1630.2(i) ("Major Life Activities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.").

Having found that walking is a major life activity, the Court now turns to the third prong of the analysis, which requires analysis of whether Plaintiff's MS substantially limits her major

finds that Plaintiff's impairment did not substantially limit a major life activity, it is also found that Plaintiff did not have a "record of" a disability pursuant to § 12102(2)(B).

life activity of walking. The ADA does not consider all impaired persons to be disabled, <u>Ryan v. Grae & Rybicki</u>, P.C., 135 F.3d 867, 870 (2d Cir. 1998); the determination of whether an individual has a disability is made on a case-by-case basis, <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 151, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000), and is based on "the effect of that impairment on the life of the individual." 29 C.F.R. § 1630, App. B; <u>see also</u> <u>Toyota Motor Mfg., Ky., Inc. v. Williams</u>, 534 U.S. 184, 198, 122 S. Ct. 681, 151 L. Ed. 2d 615 (2002) ("it is insufficient for individuals attempting to prove disability status . . . to merely submit evidence of a medical diagnosis of an impairment"). EEOC regulations define "substantially limits" to mean in relevant part "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1)(ii). In considering whether a person is "substantially limited," the regulations encourage consideration of the following factors: (i) the nature and severity of the impairment, (ii) its duration or expected duration, and (iii) its permanent or long-term impact, or expected permanent or long-term impact. 29 C.F.R. § 1630.2(j)(2).

Plaintiff alleges that she cannot walk quickly, run, skip, hop or jump. Plaintiff also testified that her "balance is off," that she has difficulty climbing stairs and that she has "constant numbness" or tingling feeling in her hands and feet. She alleges in her opposition brief that her condition is getting worse with age, however, she offers no evidence in support of this assertion. Courts have held that moderate restrictions on the ability to walk do not amount to a substantial limitation. See <u>McCoy v. USF Dugan, Inc.</u>, 42 Fed. Appx. 295, 297 (10th Cir. 2002) (a plaintiff

with MS who "could no longer bowl, dance, play tennis, or ride a bicycle," had problems with balance, "would [at times] have to hold on to the wall when walking," and "had fallen at various times" was not substantially limited); Talk v. Delta Airlines, Inc., 165 F.3d 1021, 1025 (5th Cir. 1999) (limping, "moving at a significantly slower pace than the average person," and difficulty walking in extreme cold do not constitute a substantial impairment); Penny v. United Parcel Serv., 128 F.3d 408, 415 (6th Cir. 1997) ("moderate difficulty or pain experienced while walking does not rise to the level of a disability"); Kelly v. Drexel Univ., 94 F.3d 102, 106 (3d Cir. 1996) (inability to walk "more than a mile or so" or to jog, and the need to go slowly up stairs does not constitute substantial limitation in walking); see also 29 C.F.R. Pt. 1630, App. § 1630.2(j) (walking is substantially limited if individual "can only walk for very brief periods of time"). Moreover, other courts facing claims of disability discrimination brought by plaintiffs diagnosed with MS have concluded that the plaintiffs could not meet this first element of their *prima facie* case because their MS did not substantially limit any major life activity. See, e.g., Wynn v. Whitney Holding Corp., 220 F. Supp. 2d 582, 590 (M.D. La. 2002) (granting summary judgment in favor of the employer because "[m]oderate restrictions on the ability to walk do not amount to a substantial limitation;" the court found that even though the plaintiff may suffer a "transient worsening of her gait," she had "presented no evidence that the restriction on her ability to walk is more than moderate"); Shackleford v. Gutermuth, No. 3:01CV-743-S, 2005 U.S. Dist. LEXIS 27954, at *8-9 (W.D. Ky. Nov. 10, 2005) (holding, in the case of a plaintiff diagnosed with MS who complained of spasms and numbness in her hands, dizziness, problems with her balance, and negative effects on her short term memory, that she was not substantially limited in any major life activity); Wiechen, 2006 U.S. Dist. LEXIS 70223 at *12 (granting summary judgment

in favor of employer because the plaintiff, even though diagnosed with MS, was not substantially limited in any major life activity); <u>Bezark v. Wal-Mart Stores, Inc.</u>, 176 Fed. Appx. 658, 659 (6th Cir. 2006) (upholding summary judgment in favor of the employer where a plaintiff diagnosed with MS "was able to perform, and was performing, the essential functions of his job at the time of his termination," and "was able to perform, and was performing, the functions of basic everyday living, such as caring for himself and driving to and from work," and therefore was not substantially limited in one of his major life activities). Finally, even in cases where the limitations alleged are far more substantial than the ones at issue here, courts have held that the plaintiff was not "disabled" under the ADA. <u>See, e.g.</u>, <u>Croy v. COBE Labs., Inc.</u>, 345 F.3d 1199, 1203-04 (10th Cir. 2003) (upholding the district court's grant of summary judgment on the plaintiff's ADA claim and finding no "substantial limitation of a major life activity" where the plaintiff was diagnosed with MS and "was frequently forced to take unscheduled leave, was frequently unable to lift heavy objects, could not bear 'sustained exertion,' and could not care for her children, complete household chores, or cook for her family").

In view of this precedent and the regulations, the Court finds that Plaintiff is not substantially limited in any major life activities. As she testified, her MS "never really bothered [her]" and she never needed an accommodation in order to work. Her alleged impairments are minor ones and do not rise to the level of "substantially" limiting a major life activity.

2. <u>Regarded As Having Impairment</u>

Even if Plaintiff does not have an impairment or a record of an impairment that substantially limits a major life activity, she is still considered "disabled" under the ADA if she can prove that she was "regarded as" having such an impairment. 42 U.S.C. § 12102(2)(C).

EEOC regulations provide that to be "regarded as" having an impairment means that one:

(1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation;

(2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or

(3) Has none of the impairments defined in paragraph (h) (1) or (2)[9] of this section but is treated by a covered entity as having a substantially limiting impairment.

29 C.F.R. § 1630.2(l).

The question of whether an individual is "regarded as" having an impairment "turns on the employer's perception of the employee, a question of intent, not whether the employee has a disability." Francis v. City of Meriden, 129 F.3d 281, 284 (2d Cir. 1997) (holding that "[a] plaintiff cannot state a claim under the 'regarded as' prong of the ADA . . . simply by alleging that the employer believes some physical condition . . . renders the plaintiff disabled. Rather, the plaintiff must allege that the employer believed, however erroneously, that the plaintiff suffered from an 'impairment' that, if it truly existed, would be covered under the statutes and that the employer discriminated against the plaintiff on that basis."). Therefore, to prevail under this definition, Plaintiff must establish that Defendant regarded her as having an "impairment" within the meaning of the ADA, *i.e.*, that Defendant regarded her as having an impairment that substantially limited a major life activity, and that Defendant discriminated against her on that basis. Id. at 285; Colwell v. Suffolk County Police Dep't, 158 F.3d 635, 646 (2d Cir. 1998).

---

[9] 29 C.F.R. § 1630.2(h) defines a "physical or mental impairment" as: "(1) Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine; or (2) Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities."

Plaintiff must do more than show that Defendant was aware of her impairment, as "the mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate either that the employer regarded the employee as disabled or that that perception caused the adverse employment action." Reeves v. Johnson Controls World Servs., 140 F.3d 144, 153 (2d Cir. 1998) (quoting Kelly v. Drexel Univ., 94 F.3d 102, 109 (3d Cir. 1996)).

First, there is no evidence that any of the persons involved in the decision to terminate Plaintiff's employment even knew that she had MS, much less that they perceived her as substantially limited in a major life activity. The record shows that only one management employee at BA, Jeff Drake, even knew that Plaintiff had MS. Although Drake apparently adjusted Plaintiff's hearing schedule after learning that her legs gave her difficulty on long drives, there is no evidence that this adjustment affected her job in any way. The number of hearings she attended for BA did not change, her work load in general did not change, and her representation of BA clients did not change.

Even if a decision maker at BA knew of Plaintiff's MS, however, there is still no evidence in the record showing that he or she regarded Plaintiff as substantially limited in any major life activity or that that perception led to her termination. An review of similar cases aids the Court's analysis. In Wiechen, for example, the plaintiff's supervisors were aware of his MS and suggested that he should go on long-term disability leave, as they believed that his MS substantially limited his ability to perform the requirements of his then-held position in the accounting department. 2006 U.S. Dist. LEXIS 70223 at *13-14. Even under those circumstances, however, the court found that the plaintiff had failed to establish that his employer "regarded him" as disabled under the ADA because the evidence did "not create any

inference that [his employer] believed his MS substantially limited his ability to perform a class or range of jobs beyond that one position." Id. at *14. Similarly, in Kocsis v. Multi-Care Management, 97 F.3d 876 (6th Cir. 1996), the plaintiff's employer was "was aware of her health problems, lack of energy, and mood swings," and although her employer "may have perceived that [the plaintiff's] health problems were adversely affecting her job performance, there is no evidence that defendant regarded [the plaintiff] as being unable to care for herself or to perform all of the duties of her job." Id. at 885. Accordingly, the court found that the plaintiff was unable to establish that she was disabled under the "regarded as" prong of the definition. Id. In this case, the fact that Plaintiff's schedule was altered is not sufficient to permit the inference that BA perceived Plaintiff as having an impairment that substantially limited her in one or more major life activities. See Colwell, 158 F.3d at 647 (the fact that the plaintiff police officers were assigned to light duty status on a long-term basis was not sufficient to find that they were "regarded as" having an impairment that substantially limited them in one or more major life activities). The parties agree that Plaintiff's MS did not limit her ability to perform her job; accordingly, there is no basis for concluding that BA viewed Plaintiff "as being substantially limited in [her] ability to work in [her] then-current position, much less in 'a broad range of jobs.'" Reeves, 140 F.3d at 154. Accordingly, the Court finds that Plaintiff was not "regarded as" having a disability. Because Plaintiff neither suffered from, nor was regarded as having, a disability within the meaning of the ADA—and thus is not disabled for ADA purposes—she has failed to make out a *prima facie* case of discrimination.

**B.      Adverse Employment Action Because of Disability**

Even if Plaintiff had been able to establish that she was disabled under the ADA,

18

however, she would still not be able to make out a *prima facie* case of discrimination because there is no evidence that her employment was terminated because of her disability. First, there is no evidence that any decision maker, *i.e.*, McKenna, Connelly or Bertinuson-Bonavita, knew that Plaintiff suffered from MS. The Second Circuit has made clear that "[a] defendant cannot be liable under the ADA unless it had information at the time of its pertinent decisions that would have permitted a reasonable employer to conclude that the plaintiff was, in fact, disabled." Young v. Westchester County Dep't of Soc. Servs., 57 Fed. Appx. 492, 494 (2d Cir. 2003); see also Bartlett v. New York State Bd. of Law Examiners, 226 F.3d 69, 86 (2d Cir. 2000) (holding that the defendant would not be liable for failing to accommodate the plaintiff's disability if the defendant was not aware that she was disabled); Heilweil v. Mount Sinai Hosp., 32 F.3d 718, 725 (2d Cir. 1994) ("an employer is only responsible for employment decisions based on information available to it when it decides").

Plaintiff's speculation that McKenna may have known that she had MS is not sufficient to create a material issue of fact. She has failed to produce evidence that any of the decision makers knew that she had MS or that they terminated her employment based on that fact. Plaintiff devotes the majority of her opposition brief to discussing Defendant's claims regarding her performance at BA. She sets forth no facts supporting her allegation that Defendant discriminated against her on the basis of a disability. In fact, the only discussion of her disability involves her conclusory assertion that Defendant "was looking for ways to get rid of [her] because [she] was a liability to them." She bases this allegation on the facts that Libano mentioned to Drake that Plaintiff was having problems with her legs on long drives and that Drake took this into consideration when he modified her schedule accordingly, and that as she

got older, her condition allegedly worsened. She contends that she became a "liability" to BA once Libano told Drake that Plaintiff had difficulty driving, however, there is no evidence in support of this assertion. <u>See</u> <u>Ying Jing Gan v. City of New York</u>, 996 F.2d 522, 532 (2d Cir. 1993) (to defeat summary judgment, a plaintiff must produce evidence showing a genuine issue of material fact and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible"). Accordingly, the Court finds that Plaintiff has not established that was was terminated because of a disability.

Plaintiff has failed to prove that she was disabled under the ADA or that she was terminated because of a disability, and therefore, is unable to make out a *prima facie* case of discrimination. Summary judgment in favor of Defendant is proper.

## IV.     MOTION TO COMPEL

Plaintiff also moves, pursuant to Federal Rule of Civil Procedure 57(a), for an order compelling Defendant to respond to Plaintiff's Second Request for Production.

### A.     Standard of Review

The scope of discovery under Rule 26(b) of the Federal Rules of Civil Procedure is very broad, "encompassing any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." <u>Maresco v. Evans Chemetics, Div. of W.R. Grace & Co.</u>, 964 F.2d 106, 114 (2d Cir. 1992) (quoting <u>Oppenheimer Fund, Inc. v. Sanders</u>, 437 U.S. 340, 351, 98 S.Ct. 2380, 2389, 57 L. Ed. 2d 253 (1978)). "Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party . . . Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1).

The scope of discovery, however, is not without bounds, and limitations are imposed where the discovery is "unreasonably cumulative or duplicative," overly "burdensome . . . [or] expensive" or "the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(2).

If a party fails to respond or objects to discovery, Rule 37(a) of the Federal Rules of Civil Procedure provides that the requesting party may, "upon reasonable notice to other parties and all persons affected thereby," move to compel compliance. Moreover, Rule 37(d) provides, in pertinent part, that:

> If a party . . . fails . . . to serve answers or objections to interrogatories submitted under Rule 33, after proper service of the interrogatories, . . . the court in which the action is pending on motion may make such orders in regard to the failure as are just, and among others it may take any action authorized under subparagraphs (A), (B), and (C) of subdivision (b)(2) of this rule. . . . In lieu of any order or in addition thereto, the court shall require the party failing to act or the attorney advising that party or both to pay the reasonable expenses, including attorney's fees, caused by the failure unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust.

Fed. R. Civ. P. 37(d). As referenced in Rule 37(d), subsection (b)(2) of that rule lists some of the sanctions that a court may impose for a party's failure to properly comply with discovery requests. Permissible sanctions include, but are not limited to:

> (A) An order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order;
>
> (B) An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting that party from introducing designated matters in evidence;
>
> (C) An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party . . . .

Fed. R. Civ. P. 37(b)(2)(A)-(C). An order to compel may issue after the court considers the parties' arguments and may be tailored to the circumstances of the case. Gile v. United Airlines, Inc., 95 F.3d 492, 496 (7th Cir. 1996).

**B.    Discussion**

Plaintiff filed her *pro se* Complaint, alleging that Defendant discriminated against her on the basis of a disability, in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101 et seq., on March 3, 2006. The Scheduling Order entered in this case required the parties to complete discovery by November 30, 2006 and to file dispositive motions, in compliance with the Supplemental Order, on or before December 29, 2006. On November 30, 2006, Plaintiff served her Second Set of Requests for Production on Defendant. Defendant served its Motion for Summary Judgment on Plaintiff on November 30, 2006 and its objections to Plaintiff's requests on Plaintiff on December 15, 2006. Defendant filed its Motion for Summary Judgment with the Court on December 29, 2006, and Plaintiff filed the instant Motion to Compel on January 5, 2007.[10]

Defendant first argues that it is not obligated to respond to Plaintiff's Second Set of Requests for Production because the requests, served on the final day of the discovery period, were untimely. Although Plaintiff should have served her discovery requests earlier or sought a modification of the scheduling order, the Court will not deny her motion on that basis alone. Plaintiff served her discovery requests within the scheduled time period, therefore obligating Defendant to respond.

---

[10]    Although the Motion to Compel was not docketed until March 9, 2007, it is dated January 5, 2007 and was served on Defendant on January 8, 2007. Accordingly, in deference to Plaintiff's *pro se* status, the motion will be considered filed as of January 5, 2007.

Defendant also makes substantive objections to several of Plaintiff's discovery requests. (See Def.'s Objs., Pl.'s Ex. D.)  Without evaluating the merit of Defendant's objections, the Court finds that Plaintiff's motion to compel should be denied.  None of Plaintiff's requests for production are addressed to the questions of whether Plaintiff is disabled under the ADA or whether Defendant discriminated against Plaintiff on the basis of a disability.  Indeed, according to Plaintiff, the information she is seeking through this discovery "will show more evidence that there was no legitimate reason for firing [me]." (Pl.'s Reply to Def.'s Opp'n to Mot. Compel 3.)  Even if that is true, however, Plaintiff's action will fail because she cannot set forth a *prima facie* case of disability discrimination.  Plaintiff's inability to a *prima facie* case renders the question of whether Defendant's reasons for firing her are legitimate irrelevant, as the Court does not reach that issue.  Because Plaintiff's Second Set of Requests for Production are not seeking evidence relevant to establishing her *prima facie* case, her motion to compel is denied.

## V.     CONCLUSION

For the reasons stated herein, Defendants' Motion for Summary Judgment [Doc. No. 20] is **granted**, Plaintiff's Motion for Summary Judgment [Doc. No. 16] is **denied**, and Plaintiff's Motion to Compel [Doc. No. 25] is **denied**.  The clerk shall close the case.

SO ORDERED.

Dated at New Haven, Connecticut, March _ 17 _, 2007.

_____
                                              /s/
                    Peter C. Dorsey, United States District Judge
                    District of Connecticut